585 P.2d 608

Clarence A. MONACO and Frances L. Monaco, husband and wife, Arnold E. Holman and Edda Holman, husband and wife, George J. Gerdo and Virginia Gerdo, husband and wife, Plaintiffs and Appellants,

v.

Irving H. BENNION, as Trustee of Trust A and Trust B of Bennion Benpoint, and Jane Doe Bennion, his wife, and Richard Bennion and Jane Doe Bennion, husband and wife, Defendants and Respondents.

No. 11925.

Supreme Court of Idaho.

Oct. 12, 1978.

**530**

Paul D. McCabe, Coeur d'Alene, for plaintiffs and appellants.

Frank H. Powell, Coeur d'Alene, for defendants and respondents.

BISTLINE, Justice.

This controversy stems from the unusual manner in which an access road was depicted on the plat of a subdivision of lakeshore property at Windy Bay on Lake Coeur d'Alene. In 1962, defendants Bennions, the original owners of the property, caused the plat to be made, dedicated and recorded under the name "Second Addition to Benpoint." The filed plat shows what to the casual observer would appear to be a "platted" roadway. No other roadway of any kind is indicated or depicted on the plat

1. Irving Bennion testified that when his parents purchased the property in 1928, there was no road to the point, but a path was developed in

which sets forth the owners' certificate, stating: "We dedicate the roads herein as private roads for the use of the lot owners." The plaintiffs and appellants herein, Monaco and wife, Holman and wife, and Gerdo and wife, became such lot owners. Each lot deed states that the conveyance is subject to a "right of way 10 feet wide along the back northeasterly lot line to be used by the owners of the point property."

Prior to the time of platting, there was and had been an actual existing road on the peninsula property, the approximate location of which corresponds generally with the illustrated road.[1] The existing road courses generally along the back northeasterly lot lines of the lots here involved, terminating on platted lot 5. Lot 5, comprising the tip of the peninsula, resembles an inverted isosceles triangle peninsula with approximately 290 feet of beach frontage on either side. The plat shows the private road penetrating lot 5 a distance of approximately 150 feet toward the apex of the point.

The Holmans have owned lots 3 and 4 since 1963 and 1965 respectively; lot 6 is still in the hands of the Bennions; a parcel of land within lot 5 and adjacent to the Holmans' lot 4, and across the roadway from Bennion's own lot 6, was sold to the Gerdos in 1963 and is designated as Tax No. 5618 on the accompanying diagram, a partial reproduction of defendants' exhibit E. The lot southeasterly of that, Tax No. 6128, was sold in 1964 to the Monacos' predecessors-in-title. All built cabins and used the actual existing road to gain access to the lake for the purpose of launching their boats. (Other suitable access for boat launching was four miles away.) The lotowners formed an association and spent substantial funds of their own in improving and landscaping this private existing roadway, including its traverse onto lot 5 where the boats were launched.

going there for picnicking. Later, his father had a road bulldozed on to the point.

All was well at the lake until Bennion claims to have become concerned over what he took to be Monaco's encroachments upon the "reserved easement," this being the 10-foot strip at the back of each lot. A survey (defendants' exhibit E) made at Bennion's direction disclosed that the actual existing road did not coincide with the road as sketched in on the plat (plaintiffs' exhibit 3). Bennion thereupon declared that the use of lot 5, less parcels owned by the Gerdos and Monacos, was no longer permitted, because of Bennion's plans for further subdividing it. Consequently, in the fall of 1973, he instructed his sons and workmen to destroy the actual existing road from where it extended beyond Monaco's southeasterly lot line. The road obliteration included uprooting the Benpoint Road Association's shrubbery and tree plantings. Bennion also let a contract for the placing of a fence along what was alleged to be the true boundary line common to Monaco and the remainder of lot 5. At Bennion's direction, logs and boulders were placed across the access leading down to the beach and boat-launching area.

## I. *The Roadway Controversy.*

All plaintiffs joined together in seeking to enjoin the Bennions from blockading the existing actual roadway, basing their claim for such relief on the right of use of the roadway which they contend arose from the dedication language contained in the owner's certificate. At time of trial, plaintiffs alleged additionally that the right to use that roadway had been acquired by adverse usage. We can not see from the record that the trial court ever passed upon the first contention. As to the second, the court held that any use by Monaco of the roadway to the point was with Bennion's permission, and that any use by the other plaintiffs was too sporadic to give rise to a prescriptive easement.

On appeal, all plaintiffs assign as error the trial court's finding that the use of the road was by permission, contending that such a finding is contrary to and unsupported by the evidence. We do not address this claim of adverse possession in view of our holding that the legal effect of Bennions' act in dedicating the private road shown on the Bennions' plat was to grant plaintiffs a legal right to use the existing road as a result of their status as lot owners.

As mentioned earlier, Mr. Bennion claimed to have discovered in 1973 that the "platted road" did not coincide with the "reserved road" along the back property line. Because of this he hired Mr. James LePard, a licensed civil engineer and surveyor, to survey the property for what counsel for Bennions stated as "the purpose of checking *a road easement that appears on that plat.*"

On cross-examination, Mr. LePard candidly gave this testimony as to the unsurveyed private roadway of the filed plat:

A I believe that I have reproduced the location of the platted road to the best of my ability on my map.

.　　.　　.　　.　　.

Q These dotted lines [on the 1962 plat], they are not aligned one with the other, they are not straight, some are rather curved or somewhat slant, wouldn't you say that?

A In general they align with each other, but not truly aligned.

Q Would that indicate to you they have not been drawn with instruments? In other words, had they been drawn freehand?

A That's a very distinct possibility.

Q Would it be even more than that, a probability, possibly, excuse me, that this is merely sketched in, this road?

A That is possible. I can't testify as to how it was drawn.

Q Did you check with the records of the surveyor who prepared this sketch in order to determine in what fashion they located this road on the plat?

A No, I did not.

On this point Mr. Bennion testified that the dotted lines on the 1962 plat were *generally accurate*, but that "as they *indicated* the road it was considerably further over in

relation to the property line than should be allowed, *if we were going to develop lots.*"

Mr. LePard further testified that the existing roadway (which he considered as the improved surface, on in-the-field observation), as it went south from Gerdo's property, was in the neighborhood of twelve feet in width, widening to twenty-five feet, or wider, terminating on lot 5, where it blends "with the natural topography and ground, or it may turn and go down to the lake. I don't recall."

Throughout his testimony, Mr. LePard referred to the road shown on the plat as a "platted road." Nonetheless, just as all that glitters is not gold, all roadways sketched or illustrated on plats are not platted roads. The use of the word "plat" signifies a subdivision of land into lots, streets and alleys, marked upon the earth, and represented upon paper."[2] *McDaniel v. Mace,* 47 Iowa 509, 510 (1877). *See also* Black's Law Dictionary (4th ed. 1968).

Idaho Code, § 50–2501 as it read in 1962, required the Bennions, in proposing a subdivision, to cause the same to be surveyed, and a plat made, which plat was required to particularly and accurately describe the streets, giving width, boundaries, extent, and courses of certain lines sufficient to determine the course of all streets. I.C. § 50–2502 required that the correctness of the plat be certified to by the surveyor. Required also was "a deed of donation of all streets and alleys shown on said plat." Where the subdivided land lay outside corporate limits of a municipality, the plat was required to be submitted, accepted and approved by the board of commissioners. I.C. § 50–2503 required, that where a plat was of lands "divided into lots and blocks with streets, alleys, avenues, or public highway thereon, *dedicated to public use,*" that the intersections of such streets, avenues and public highways, be marked with suitable monuments. "The locations and descriptions of all monuments shall be carefully

recorded upon the plat, and the proper courses and distances of all boundary lines shall be shown."

Bennion who is an attorney, apparently believed that these provisions were not applicable to a plat without any streets, avenues, or highways which were dedicated *to the public,* and presumably so instructed his retained surveyor. The plat shows iron pin markers as to each and every lot corner, and shows courses and distances as to each lot, but is entirely silent as to the course, width and extent of the private road; nor are any iron pin markers shown which could help locate the illustrated private road. It is depicted on the plat only by an irregular series of irregular hashmarks.

█ A "platted" public road, if such it is to be properly called, results from a survey conducted on the earth itself, and so, too, a platted "private" road must first be surveyed, accurately and particularly described, and then the correctness of the survey and the platting certified to by the surveyor. Here the surveyor, Mr. Ray H. Kindler, certified only that "iron markers were placed in the ground as shown on this plat." As mentioned, no markers whatever grace the illustrated road. Mr. LePard stated that he did not know of any survey which had been made of the private road at the time of platting, and conceded that his own creation was a mere graphic transmittal of that road which was shown on the plat. The record is devoid of any proof that the private road shown on the filed plat had ever been surveyed; contrariwise, the plat itself evidences it did not portray a surveyed road.

The present case bears a marked similarity to the issues which were before the Court in *Smylie v. Pearsall,* 93 Idaho 188, 457 P.2d 427 (1969). That case concerned a parcel which had not been given a designated lot number and which was located on the lake at the western terminus of a strip of land designated "drive-way" which in turn

---

**2.** Five years after Bennion's plat was filed, the 1967 legislature enacted I.C. § 50–1301 which, though not applicable to this case, defines "plat" as "[t]he drawing, map or plan of a subdivision, cemetery, townsite or other tract of land, or a replatting of such, including certifications, descriptions and approvals."

connected to a "road." The disputed parcel formed a natural boat launching and landing area at the terminus of the driveway. There had been no written dedication of the parcel at issue. Nonetheless, the trial court, on the theory of a common law dedication, found that such a parcel, being no part of the platted lots, was dedicated to the public. This Court, in affirming the decision of the trial court, held as follows:

When an owner of land plats the land, files the plat for record, and sells lots by reference to the recorded plat, a dedication of public areas indicated by the plat is accomplished. This dedication is irrevocable except by statutory process. The original owner and platter of such land is estopped to deny the dedication of public areas indicated on the plat. One purpose of this doctrine is to protect the interests of purchasers of platted lots in their reliance upon the valuable maintenance of such public areas.

*Id.* at 191, 457 P.2d at 430.

In *Smylie* this Court quoted approvingly from *Cassell v. Reeves,* 265 S.W.2d 801 (Ky. 1954). In that case, the Kentucky court held that when streets have been delineated on a map or plat, and the same has been recorded, and conveyances made by reference thereto, a dedication is thereby effectuated to the use of the purchasers of the lots and those claiming under them as well as to the public:

It is presumed that all such places add value to all the lots embraced in the general plan and that the purchasers invest their money upon the faith of this assurance that such open spaces, *particularly access ways, are not to be the private property of the seller.*

*Id.* 93 Idaho at 192, 457 P.2d at 431 (emphasis added).

The situation at bar is slightly different. In *Smylie* the claim was made that the parcel in question had become dedicated *to the public* by operation of law. Here no such claim is made by the plaintiff lot-owners, who are undoubtedly as interested as are Bennions that the road *not* be public. The exact terminology used by plaintiffs is

that the Bennions' actions in obliterating the road and denying plaintiffs access to the only road which provided them boat launching is "contrary to the dedicated purpose of the roadway as reflected by the filed plat." Bennions' plat, both by the portrayal of a private road and by the language of the owners' certificate, clearly showed that a roadway existed, which was intended to remain as a *private* road for the use of the owners. What was said in *Smylie* and *Cassell* has equal application here. It is presumed that the existing private roadway added value to all of the lots embraced in the general plan of the plat, and that purchasers invested upon the faith of the assurance that such access ways to the lots and to the boat launching area would not remain the totally private property of the owner. The original owner and platter, having "dedicated" the private roadway for the use of lot purchasers, is estopped to deny that which he has so plainly declared. We hold that the legal effect of illustrating a private road on a filed plat and "dedicating" it is the creation of an easement in favor of the lot purchasers.

The roadway so dedicated is that road which physically existed on the earth, and that which the lot owners or their predecessors presumably viewed in transactions leading to and resulting in lot purchases. Upon remand the precise location of the existing road should be ascertained. For this purpose, the trial court shall order the Bennions to have a survey of the road made and located on the plat of Benpoint Second Addition. The final judgment to be entered herein shall provide that such roadway is available for use by the lot owners and that they have an easement to the use thereof. The Bennions will be enjoined from interfering with said roadway and will be required to restore the roadway to its former condition, as prayed for in plaintiffs' amended complaint.

## II. *Monaco's claim.*

Apart from the roadway issue in which all plaintiffs joined, Monaco and wife alleged three separate claims: (1) a prescrip-

tive claim to the use of a portion of Bennion's lot 5 for the purposes of a roadway providing access to the lower level of the cabin built on their lot; (2) a prescriptive claim to the use of another portion of lot 5 where the dry well of their septic system extended beyond their lot line; and (3) a prescriptive claim where a corner of the cabin's eaves overhung the 10-foot reserved roadway. On this last claim, the trial court ruled in favor of the Monacos and no appeal was taken from this ruling. However, on issues (1) and (2), the trial court found the evidence insufficient to sustain Monaco's claim. The court held that Monaco's use as to (1) had been with Bennion's consent. As to (2), the court found that the dry well encroachment, *insofar as it was under* the reserved easement, constituted no interference and need not be removed; Monacos were, however, ordered to remove from Bennion's portion of lot 5 any of Monaco's sewage facilities which did encroach. Monaco's rather terse claim of error is that the evidence does not sustain the judgment denying the claimed prescriptive easements, (1) and (2).

▆▆▆ The consensus of the Court is that, were we not reversing the trial court's decision denying the lot owners the use of the roadway as dedicated to them, we would be inclined to affirm the trial court with respect to Monaco's claims (1) and (2) on the usual grounds that the findings of the trier of the fact, based on substantial though conflicting evidence, should not be disturbed on appeal. *Wright v. Wright,* 97 Idaho 439, 546 P.2d 394 (1976). On (2), the dry well encroachment, the trial court's memorandum decision adverse to Monaco appears to rest mainly on the testimony of the man who made the installation for Monacos:

> Monaco contended that the septic tank and dry well were installed in June of 1968. Defendant's Exhibit Q, an application and permit for the installation of the septic tank, was dated August 1, 1968 and indicated on the first page *that the septic tank had already been installed* and indicated in the application form that they were applying for a permit to construct a sewage disposal system.
>
> The man who installed the septic tank testified that the tank was installed in September of 1968. This becomes critical as the Complaint in this action was filed August 1, 1973. The court finds that the plaintiff Monaco has not sustained his burden of proving, by clear and convincing evidence, or even by a preponderance thereof, that the tank was installed more than five years prior to the filing of the Complaint. (Emphasis added.)

We note that the testimony of the installer is not as positive as might be desired if a finding is to hinge on his testimony alone. His recollection was that he had installed the system after August 1, 1968, but after answering that he completed it that same month, he allowed himself to be readily led, without objection, into stating that the month was September. When he was on the stand, he was not shown any of the exhibits, which might have been of some aid in stirring his recollection. We note also that a degree of verity attaches to an official document (such as the septic tank permit in the present case) which states that something has been done, requiring more than a mere preponderance to overcome the fact which the document declares to have taken place. Moreover, the trial court made no indication as to what consideration was given to plaintiffs' exhibits 20, 21 and 22, color photographs of the system being installed. On the reverse side of each photograph is written "June, 1968." Equally important is the clear portrayal of green grass and of shrubbery in full bloom, which shrubbery appears to be of a variety common to north Idaho and which is not known to bloom again in September.[3] Taking to-

**3.** These photographs are not at all mentioned in plaintiffs' briefs. Because this appeal rests upon a challenge to the sufficiency of the evidence to support the findings, we have read the record and assume that the exhibits were also included in the appeal record on the basis that these, too, would be considered. We are somewhat astounded that counsel did not call to the attention of the trial court the dates which appeared on the exhibits, and that foliage in

gether this physical evidence with the application stating that the installation had already been made, the question becomes a close one.

For all of the above reasons, we reverse the judgment insofar as it pertains to Monaco's dry well encroachment; but we do not direct a new trial on that issue. We leave the matter of further proceedings to the discretion of the trial court, who is in a better situation than are we to consider the granting of a new trial on that issue, as to whether such a grant would be appropriate and in the interests of justice and judicial administration.

On claim (1), Monaco's roadway and parking, an appellate court could ordinarily be expected to affirm, again on the usual and well-established rule. Throughout the trial, on Monaco's claim, and on the claim of all lot owners that a prescriptive right had been acquired for the use of the actual existing roadway, Bennion steadfastly stated that everything which took place was always without his having objected. A factfinder who has heard and seen the witness could possibly have interpreted Bennion's testimony as his peculiar way of saying that he extended permission.

■ Nonetheless, the question is close and appears to have been decided without counsel's ever having brought to the trial court's attention the holding of *West v. Smith,* 95 Idaho 550, 511 P.2d 1326 (1973).[4] That case established the principle that failure to object amounts to mere passive acquiescence, not an active grant of permission such as might serve to defeat a claim of adverse possession:

> Although language in one Idaho case, and in some cases from other jurisdictions, implies that acquiescence on the part of the owner of the servient tenement is synonymous with consent and permission,

the better rule draws a distinction. In the ordinary case, mere inaction and passive acquiescence is not a sufficient basis for proving that the use of the claimed right was with the permission of the owner of the servient tenement.

*Id.* at 557, 511 P.2d at 1333.

■ Because our main holding—*viz.,* that *all* of the lot owners (including Monaco) are possessed of an easement to use the existing roadway where it penetrates into lot 5—may moot the Monacos' claim to a prescriptive use, we are reversing the trial court's determination that Monaco failed to establish an adverse use regarding the roadway and parking area. More specifically, we note that the portion of lot 5 still belonging to Bennion, against which Monaco lays his claim of prescriptive use, *appears* to be that part of the existing road where, according to Mr. LePard, it widens significantly, turns and traverses toward the shoreline and boat-launching area of the lake. If such be the case, Monaco, along with *all* of the lot owners, would have a right to the use of such access roadway, including where it widens for the necessary maneuvering of boat trailers, by reason of the easement we hold has been created. If not the case, the trial court is allowed, but not directed, to redetermine Monaco's prescriptive claim.

In summary, we reverse that portion of the judgment denying all of the plaintiff lot owners the use of the existing roadway, with directions that the trial court determine the physical location of the existing road as of the time the plat was filed. At Bennion's expense that actual roadway shall be surveyed and a plat thereof prepared, with the final decree to provide that the lot owners are possessed of an easement to use that roadway as access to their various lots. In any instances where said roadway does not reach their lots, an easement of

bloom was readily apparent, the nature of which the trial court was in an enviable position to evaluate.

4. Plaintiffs' first brief submitted to this Court failed to contain a single authority. The Court ordered that additional briefs be submitted, directing counsel's attention, *inter alia,* to the case of *West v. Smith, supra.* In a supplemental brief, plaintiffs' counsel minimized the holding in *West* as being mere dictum and distinguished the case away on the grounds that his appeal "was taken not on a question of law but on a question of fact."

necessity from the said actual road to the lots shall be decreed. The trial court, and the parties, too, may see the advisability of following the procedure outlined in *Lisher v. Krasselt,* 94 Idaho 513, 517, 492 P.2d 52, 56 (1922).

In addition, we affirm the trial court's judgment insofar as it decreed a prescriptive right in Monaco and wife to the overhang of their eaves above the reserved easement. The judgment insofar as it denied the Monaco claims to prescriptive use of Bennion property for the roadway and parking access, and the dry well encroachment, is reversed for further proceedings in accordance with the views hereinabove expressed.

Costs to appellants.

SHEPARD, C. J., BAKES, J., and SCOGGIN, J. Pro Tem., concur in Part I.

BAKES, J., and SCOGGIN, J., Pro Tem., concur in Part II.

DUNLAP, Justice, Pro Tem., dissenting.

The record in this case reflects that the apparent issue of estoppel discussed in part I of the majority opinion was not resolved by the trial court. This issue was raised by the pleadings and is one of both law and fact.

The failure of the Court to determine this issue is not explained, was not assigned as error on appeal, mentioned in any of the briefs or urged on oral argument. No new trial was requested. In view of this state of the record, I am not willing to engage in the exercise of the intellectual snobbery of raising and determining this issue on appeal.

This case was tried below solely on the theory of prescriptive rights, decided on that basis alone and the trial court's decision on that question is the only issue raised on appeal by the parties. The absence of a decision on the estoppel issue may or may not have been intentional on the part of the court and parties and I am not about to assume that the trial court erred in not determining this issue.

I would remand this case for the sole purpose of enabling the court to make a determination of record if this was indeed an issue on trial between the parties and if it was to adjudicate same on the theories set forth in the majority opinion.

I am of the opinion that the trial court should be affirmed in its decision concerning the prescriptive right claims of the respondents. This case was tried to an able and experienced trial judge and I believe we should not depart from the long established rule of this Court that the findings of the trier of the facts based on substantial, competent though conflicting evidence should not be disturbed on appeal. *Wright v. Wright,* 97 Idaho 439, 546 P.2d 394 (1976).

SHEPARD, C. J., concurs.

[Defendants' Exhibit E]

[Partial reproduction of
Plaintiffs' Exhibit 3]

[Pa
Plai..

• Indicates Iron Pin Marker
Bearings are from G L O Bearing for N. Line Sec 20