613 P.2d 367

**John M. ELDER and Raquel P. Elder, husband and wife, Plaintiffs-Respondents,**

v.

**NORTHWEST TIMBER COMPANY, a division of the Pack River Company, Defendants-Appellants.**

No. 12514.

Supreme Court of Idaho.

May 7, 1980.

Rehearing Denied June 30, 1980.

W. W. Nixon, and Marshall C. Aungier of Nixon, Nixon, Lyons & Bell, Coeur d'Alene, Dale G. Higer, of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendants-appellants.

Scott W. Reed, Coeur d'Alene, for plaintiffs-respondents.

SHEPARD, Justice.

This is an appeal from a judgment wherein plaintiffs-respondents were awarded damages, both actual and punitive, as the result of defendants-appellants constructing a roadway across the property of plaintiff-respondents. The court further enjoined defendants from any future use of the road and further required defendants-appellants to pay the costs of a court-ordered survey. We affirm.

We note initially that appellants' contentions on appeal are limited to the trial court's findings and interpretation of the facts as they are reflected by its decision that no right-of-way, public or private, existed over plaintiffs-respondents' land allowing for the constructing and use of the road. Assuming that the trial court was correct in that portion of its decision, there is no contention on appeal that the trial court erred in its allowance of damages, either actual or punitive, that the trial court erred in its issuance of an injunction against the defendants-appellants, or that it erred in requiring defendants-appellants to pay the costs of the court-ordered survey.

Defendant-appellant Northwest Timber Company and plaintiffs-respondents Elders own adjoining tracts of land in a remote area of Kootenai County, Idaho. In 1909, the predecessors in interest of both the Elders and Northwest Timber dedicated portions of their land to be used for a road. Sometime shortly thereafter a road of some type was built pursuant to a Kootenai County Board of Commissioners' survey which traversed the Elders' property. That road was used infrequently until 1927, when it was used by one-ton trucks to haul logs out of the lands of the predecessor in interest of Northwest Timber. That use stopped in 1929. Sometime between 1928 and 1943, the road was at least partially washed out at its point of entrance to the Elder property and that damage was never repaired. There is no evidence that public funds were ever expended for either construction or maintenance of the road.

In 1972, there was no usable road over the Elders' property; rather, there were only some barely discernable tracks which disappeared into dense shrub and timber. Apparently, those tracks were remnants of the road built in approximately 1909. Northwest Timber purchased its property in December, 1972, and the Elders purchased their property in January, 1973. The above recital is reflected in the trial court's findings of fact and is based upon essentially uncontroverted testimony.

During an inspection of his property in May, 1973, Elder found deep ruts across it which he believed had been caused by Northwest Timber's logging trucks. He contacted an employee of Northwest Timber and learned that Northwest claimed a right-of-way across the Elder property. Elder denied such right and thereafter the parties negotiated as to various alternative routes which Northwest might use across plaintiffs' property. In all of such discussions, Elder was assured that a written agreement would be prepared and sent for his approval. However, plaintiffs never received such an agreement and heard nothing more from Northwest. When Elder returned again to his property in March, 1974, he found that Northwest Timber had, in December, 1973, constructed a road across the Elder property along a route which Northwest believed to be the old 1909

survey route. The immediately above stated chronology is also reflective of the trial court's findings of fact, which are based upon substantial, if somewhat conflicting, evidence, and therefore will not be disturbed.

The construction of the road by Northwest Timber across the Elder property and other actions of the defendant caused substantial damage to plaintiffs' property, which the trial court assessed at $15,439.00. As aforesaid, the existence of or the extent of those damages is not raised on appeal. The trial court also concluded:

> "In view of the cavalier manner in which defendant tore up plaintiffs' land when it knew the existence of either private or public right-of-way was disputed and after leading plaintiff, JOHN ELDER, to believe a written agreement would be submitted for his approval and thus lulling plaintiffs into a false sense of security, the Court is of the opinion punitive damages should be assessed."

As aforesaid, Northwest Timber does not on appeal contest the award of punitive damages.

We reiterate that the only issue on appeal is whether or not a right-of-way existed over the land of the Elders which allowed the construction and use of the road by Northwest Timber. Northwest contends that their construction and use of the logging road was permissible, as the use of either a public highway or a private easement.

The trial court held that no public highway had ever been created and that even if such highway did at one time exist, it had since been abandoned. We agree. Prior to its amendment in 1963, I.C. § 40–104 provided, "A road not worked or used for the period of five years ceases to be a highway for any purpose whatever." [This statute was amended in 1963 to provide in pertinent part, "A road established by prescription not worked or used for the period of five (5) years ceases to be a highway for any purpose whatever * * *."] The trial court found that no public funds were expended for maintenance at any time on the alleged highway over the land of the Elders. It was further found that a washout occurred between 1928 and 1943, and that such damage was never repaired. While some conflict exists in the evidence, we hold that there is substantial and competent evidence to support the trial court's finding of non-use and non-work prior to 1963 for the required five year period. We, therefore, uphold the trial court's determination of abandonment. E. g., Bradford v. Simpson, 98 Idaho 830, 573 P.2d 149 (1978); I.R.C.P. 52(a).

Northwest Timber next contends that a private easement existed over the Elder property allowing for the construction of the logging road. There is, however, substantial and competent evidence to support the trial court's finding that no private easement was ever created and that even if a private easement did exist, the construction and use of the logging road constituted an impermissibly expanded use of the easement. E. g., Palmer v. Fitzpatrick, 97 Idaho 925, 557 P.2d 203 (1976); I.R.C.P. 52(a).

A private easement may be created by express agreement, by implication, or by prescription. E. g., Shultz v. Atkins, 97 Idaho 770, 554 P.2d 948 (1976). The record provides no indication of any express agreement establishing an easement. Easements by implication require an original unity of ownership of the parcels which later become dominant and servient estates. 3 Powell on Real Property § 411 (1979). The record is devoid of any evidence of an original unity of ownership.

The creation of a private easement by prescription is not favored at law. E. g., Gibbens v. Weisshaupt, 98 Idaho 633, 570 P.2d 870 (1977). The elements of a prescriptive easement are described in West v. Smith, 95 Idaho 550, 511 P.2d 1326 (1973):

> "A claimant *· * * must submit 'reasonably clear and convincing' proof of open, notorious, continuous, uninterrupted use, under a claim of right, with the knowledge of the owner of the servient

tenement, for the prescriptive period." *Id.* at 557.

That prescriptive period in Idaho is five years. *Deer Creek, Inc. v. Hibbard*, 94 Idaho 533, 493 P.2d 392 (1972); I.C. § 5–203.

■ Northwest Timber contends that the use of a road over the Elders' land by Northwest Timber's predecessors in interest established a prescriptive easement allowing for the construction of a logging road in 1974. While there was some evidence of the use of a road over the Elders' land in approximately 1912 and again from 1927 to 1929, the record is devoid of any evidence that the predecessors in interest of Northwest Timber used the Elders' land for the required five year period. Northwest Timber next contends that a prescriptive easement ensued from some travel by automobile over the Elders' land a few times a year from 1924 to the present. The trial court found that although such an easement might have been created, the construction of the logging road constituted an impermissibly expanded use of the easement. We agree.

■ As a general rule, an easement acquired by prescription is confined to the right as exercised during the prescriptive period. *E. g., Aztec Limited, Inc. v. Creekside Investment Co.*, 100 Idaho 566, 602 P.2d 64 (1979); Restatement of Property § 477 (1944). While some change of usage is permissible, "any changes in the use of a prescriptive easement cannot result in an unreasonably increased burden on the servient estate * * *." *Gibbens v. Weisshaupt, supra*, 98 Idaho at 639, 570 P.2d 870.

■ While general principles of permissible increased easement use can be gleaned from *Gibbens v. Weisshaupt, supra*, and *Aztec Limited, Inc. v. Creekside Investment Co., supra*, questions regarding the scope of easements are "so largely a function of the circumstances and of the time that opposite conclusions on variant sets of facts are to be expected." 3 Powell on Real Property § 415 at n. 32. Both *Gibbens* and *Aztec*

involved fact situations of increased traffic and physical expansion, which the court stated constituted impermissible burdens on the servient estate. The easement in the present case, assuming one did exist, is contended by appellants to have been created by infrequent automobile use. We hold on the record before us that the much greater and intensive use of the claimed easement, together with the obvious physical expansion, resulted in a substantially greater impact on the servient estate. Clearly, the construction of the logging road imposed a burden on the Elders' land as great or greater than the burdens found to be impermissible in *Aztec* and *Gibbens*. The undisputed findings of the trial court indicate that well over one million board feet of timber were transported across plaintiffs' property, and that it would cost approximately $10,439.99 to repair the physical changes that Northwest Timber had made on the Elders' property. We hold that Northwest Timber's construction and usage of the logging road across the Elder property constituted an unreasonably increased burden on the Elder land and is thus impermissible. *See* Restatement of Property §§ 478, comment d, 480 illustration 4 (1944).

The judgment of the trial court is affirmed.

DONALDSON, C. J., and McFADDEN, J., concur.

BAKES, Justice, dissenting:

I agree with Justice Bistline that Exhibit C, set out in footnote 3 of Justice Bistline's dissent, created a private right of way between the property owners on the lands described in that exhibit, and that both the trial court and the majority of this Court have not accorded the appellants the rights which they are entitled to under that document.

BISTLINE, Justice, dissenting.

In *Monaco v. Bennion*, 99 Idaho 529, 585 P.2d 608 (1978), an owner of a lakefront

subdivision illustrated a private roadway on the plat which he caused to be prepared and recorded. The illustrated roadway did not coincide with an existing roadway which was the means of access by which that owner's lot purchasers came off a county road in order to reach their lots. Sometime later, in order to gain more lots out of his subdivision, the owner attempted to restrict the lot owners from the use of some portions of the existing roadway. The owner prevailed upon a local surveyor to "provide" a metes and bounds description of the illustrated private roadway, and thereafter insisted that the lot owners confine their ingress and egress to this new roadway which the owner had caused the surveyor to lay out on the physical surface of the subdivision.

We reversed, holding that the lot owners were entitled to use the actual existing roadway. A holding in that case, and which is of significance in this case, was that we accepted the proposition that the owner had dedicated a "private roadway" for the use and benefit of his lot owners. We accepted the fact that neither the dedicators nor the lot owners desired that the dedicated roadway should be open to the general public. There was no showing that the roadway was ever maintained by Kootenai County. On the contrary, the roadway had been improved solely by the efforts of the dedicators and an association of lot owners in

which the dedicators participated as members. All of the events in that case were of fairly recent origin.

In the case under consideration the chronology of events began over seventy years ago, in 1909. At that time travel in northern Idaho was more by rail and water than it was by motor vehicle. There was no statewide highway system under a State of Idaho Department of Transportation.[1] Such public roads as existed were under the control of the Board of County Commissioners of the various counties.[2] Logging was largely done in the wintertime, and logs were for the most part moved by the area's streams, rivers and lakes—augmented by flumes. Where feasible there were logging railroads, and logs were also moved by horse-drawn sleds. In short, the north Idaho of 1909 was not the north Idaho of today. With that preface in mind, we proceed to consider the 1909 conduct of land owners in Kootenai County who desired that the properties of each of them should not be landlocked, but should thereafter have access to the county road system then existing.

Documentary evidence was adduced at trial establishing that the predecessors-in-interest of both plaintiff and defendant joined with neighboring land owners in executing an agreement, Exhibit C,[3] which

1. The first vestige of any state system of highways came in 1907 with the passage of legislation creating the State Highway Commission. 1907 Idaho Sess. Laws p. 466. Primarily it provided that the newly created commission could notify boards of county commissioners of county roads out of repair, and upon 30 days and county inaction, the commission could let the work to a contractor who was authorized to take over dominion of the road by repairing it and collecting tolls. Minor changes were made in 1913.

2. The creation of highway districts in the counties was provided for by the legislature in 1911, 1911 Idaho Sess. Laws ch. 55, pp. 122–24.

3. Exhibit C:

"State of Idaho )
      ) ss.
County of Kootenai )

"WHEREAS, A road was ordered surveyed on the 14th day of July, A.D., 1909, by the Board of County Commissioners of said county, on the petition of ten freeholders of said county: which said road is set forth and described in the Commissioners' order as follows, viz: Beginning at the end of the County Road in sec. 30, T. 48 N., R. 1 W.B.M., and extending through 30, 29 & 32, T. 48 N., R. 1 W.B.M. and secs. 5 9 4, T. 47 N., R. 1 W.B.M. to the southeast corner of section 4, which said road passes through certain lands owned by parties as described below.

"NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, That we the owners of the land described below, for value received, do hereby release all claims to damages sustained by us by reason of the survey and opening said road through our lands, viz:

quite obviously had for its purpose to secure to them and each of them, as an encumbrance upon the respective properties of all and each of them, a right-of-way for ingress and egress. There is no suggestion that they were trying to open up their collective properties to the public. Although Exhibit C called for a fifty-foot right-of-way, what evidence was available at time of trial over two-thirds of a century later shows that those early pioneers, with what crude equipment they had at that time, apparently built for themselves such manner and means of an actual roadway as was essential for getting in and out with such teams and wagons as they had at that time. As to what took place in that early day, respondent's brief seemingly summarizes it nicely: "There was absolutely no credible evidence that any public body had ever done any work or spent any money on any road across the Elder property."

Appellant states it thus: "By 1912 at the latest, a road, used by predecessors of both the Plaintiff and Defendant, was established." Appellant points to a statute then effective which gave recognition to the fact that it wasn't necessarily always going to be county government which attended to the building of roads: "Highways are roads . . . laid out or erected by the public, or if laid out or erected by others, dedicated or abandoned to the public." Revised Statutes of 1887, § 850.

The Court's opinion states that the building of a road occurred, placing the credit neither with the county nor with the dedicating owners:

"Defendant-appellant Northwest Timber Company and plaintiffs-respondents Elders own adjoining tracts of land in a remote area of Kootenai County, Idaho. In 1909, the predecessors in interest of both the Elders and Northwest Timber dedicated portions of their land to be used for a road. Sometime shortly thereafter a road of some type was built pursuant to a Kootenai County Board of Commissioners' survey which traversed the Elders' property. That road was used infrequently until 1927, when it was used

| OWNERS OF LANDS | DESCRIPTION OF LANDS | SEC. | TOWN | RANGE |
| --- | --- | --- | --- | --- |
| John Conn | SE ¼ SW ¼ & SW ¼ SE ¼ | 30 | 48 N. | 1 W. |
| G. N. Butler | NE ¼ SW ¼ | 4 | 47 N. | " |
| M. Clinton | NW ¼ SE ¼ | " | " | " |
| Jake Conachen | SW ¼ SW ¼ Lot 4 (Sec. 32), | 29 | 48 N. | " |
| | & SE ¼ SE ¼ | 30 | " | " |
| H. H. Rankin | W ½ NW ¼ & N ½ SW ¼ | " | " | " |

"IN WITNESS WHEREOF, we have hereunto set our hands and seal this 30th day of July A.D., 1909.

"Signed and Delivered in the Presence of   John Conn
                                          G. N. Butler
                                          Alice Butler
      Paul Williams                     M. Clinton
                                          Jake Conachen
                                          H. H. Rankin
                                        E. G. Rankin
                                        C. H. Williams

. . . .                # 260.

"BUTLER ROAD.

"Twp 47, 48 N R 1 W B M.
Declared a highway Aug. 10, 1909.
Surveyed by Modlin July 31,   "
See Reporters book page # 28, 35.
  "   Twp plats.

Note: See Road # 296.

  (Secs. 29, 30 & 32; T 48 N)
  (Secs. 4 & 5; T 47 N)"

(See attached map)

by one-ton trucks to haul logs out of the lands of the predecessor in interest of Northwest Timber. That use stopped in 1929. Sometime between 1928 and 1943, the road was at least partially washed out at its point of entrance to the Elder property and that damage was never repaired. There is no evidence that public funds were ever expended for either construction or maintenance of the road."

I have no concern with that part of the Court's opinion which agrees with the trial court that no public highway was ever created. The Court having so concluded then proceeds to say, nonetheless, that had a public highway been created, it was thereafter abandoned. My only concern there is that the Court seems unsure of the trial court's first conclusion. My concern, however, is with the following paragraph of the Court's opinion:

"A private easement may be created by express agreement, by implication, or by prescription. E. g., Shultz v. Atkins, 97 Idaho 770, 554 P.2d 948 (1976). The record provides no indication of any express agreement establishing an easement. Easements by implication require an original unity of ownership of the parcels which later become dominant and servient estates. 3 Powell on Real Property § 411 (1979). The record is devoid of any evidence of an original unity of ownership."

It seems abundantly clear that those owners who in 1909 executed Exhibit C had in mind the desirability of securing to themselves and their successors in interest a right-of-way across the property of such neighbors as necessarily had to be obtained so that they and each of them were not landlocked, and at the same time they were willing to and did give passage across their own properties. While the law at that time probably allowed for the county to seize upon Exhibit C as a predicate for taking the "Butler" road into the county road system, whether it did or not is not necessary of determination if the interest of the parties to Exhibit C is given proper recognition. Independently of the holding of the Utah court in Sowadzki v. Salt Lake County, 37 Utah 127, 104 P. 111 (1909), decided in the same year, that Exhibit C was executed, I would hold that the parties to Exhibit C created express right-of-way easements against each property in favor of the other property, or, alternatively, at least that the provisions of Exhibit C implicitly created such easements. Any other result renders the well considered intentions of those parties a nullity—which is against all known propositions of law.

If it is necessary to indulge in a unity of ownership theory in order to determine if here there arose an easement by implication, it is at once apparent that the entire property over which the intended roadway was to traverse was owned by a combination of all the owners. The language of the Restatement of Property, § 476, Comment h, is applicable:

"That the conveyor and the conveyee receive reciprocal benefits from the implication of an easement in favor of each contributes to the implication. The fact that both receive benefits and neither alone suffers from the creation of the easement makes it more probable that they intended its creation. Hence, even in cases where the necessity alone would not have been sufficient to justify the implication of an easement in favor of the conveyor, the fact that the circumstances are sufficient to warrant the implication in favor of the conveyee, and that like benefits would accrue to both the conveyee and the conveyor, may justify the inference that an easement in favor of each was intended. . . ."

In Harless v. Malcolm, 87 S.E.2d 817, 820 (Va.1955), the factual situation was much like that here, and the contentions also similar:

"The evidence to prove that this road was apparent and that it had been in use for any certain time or was reasonably necessary for the beneficial enjoyment of

the several tracts of land at the time that Conrad Sharrett divided and willed the 600 acres to his several devisees is meager and may not establish an easement by necessity. *Jennings v. Lineberry*, 180 Va. 44, 21 S.E.2d 769; *Muse v. Gish*, 114 Va. 90, 75 S.E. 764; 1 Minor, Real Property (2d ed.), § 98. But we need not decide the question of whether or not an easement of necessity over the 97-acre tract in favor of the William R. Sharrett tract of 108 acres was intended by the testator or created in the division of his estate. The evidence is ample to sustain the finding and complainants concede that an easement along this road was actually granted in 1909 in favor of one tract of land bordering thereon, though the instrument creating it was never recorded. Complainants now claim that the Robert W. Sharrett tract of 109½ acres was the sole dominant estate in this admitted grant. Yet the action of the landowners along the road, including that of complainants, show that they all construed the easement as beneficial to the three tracts of land of 109½ acres, 108 acres, and 97 acres, which were then owned respectively by Robert W. Sharrett, Edward T. Large and R. N. Crowell.

"All parties who have acquired property along this road's entire length of some three-fourths of a mile, who were successors in title to those three owners, have used it at will as a means of access to the public highway. Whether this right of general use by the owners of all tracts of land along this road was recognized and appurtenant to the several tracts when willed by Conrad Sharrett is not now important. The facts show that a reciprocal easement appurtenant to these three tracts was created by grant and agreement of the owners in or about the year 1909 and has been continually exer-

cised since that date. This being true, it necessarily follows that an easement of ingress and egress appurtenant to and for the benefit of defendant's tract exists along the road, and the relief prayed for ·by complainants was rightly refused. The decree of the trial court will be affirmed."

Mention should also be made that the trial court and the majority of this Court each enter into a discussion of the history of the use and non-use of the properties involved as though in a vacuum. Especially is much made of the non-use of the properties, and the road which was created to provide access for each property. In the first place one has to consider exactly what use did an owner make of such properties in those early days—in fact up and until about ten years ago? The answer is "very little," and I fail to understand how it is so easily overlooked that scarce and intermittent use of a property [4] and the access to and from it is in itself an excellent reason for the concerned parties to execute some form of written agreement that mere passage of time will not exterminate.

I do not comprehend how the other members so easily forget the 1930's—when thousands of acres of such timberland as this were of so little value, and money so scarce, that the property was allowed to go for taxes, and went unpurchased at tax sales.[5] How easily we forget.

It is not readily seen how the result in this case should differ from that in *Monaco v. Bennion, supra.* In that case the owner of the entire property, before embarking on a program of breaking it down into lots, created a dedicated access in favor of all of the lots which he proposed to sell. Here, there may have never been one owner of all properties, and it is only of consequence that all affected and interested owners joined in executing that instrument which

---

4. In 3 Powell on Real Property § 405 at 34–14 n. 15 (1979), the distinction is made between continuous and discontinuous easements: "Continuous servitudes are those of which the enjoyment is or may be continual, without the necessity of an actual interference by man."

5. In an adjacent county the county commissioners purported to deed thousands of such acres to the federal government because the land had no value.

most obviously to their minds would produce the desired legal effect. To this point neither the trial court nor the majority of this Court has given any satisfactory explanation as to the insufficiencies of Exhibit C which defeat its purpose. Nor has a more appropriate or more legally sufficient form of agreement been suggested.

One might gather from that portion of the Court's opinion above quoted that the various owners were required to play out the fiction of unities which once were said to be required in order to create estates of joint tenancy. If so, I would not agree, and seeing no Idaho case law which would require the adoption of such fiction in the mutual creation of access easements across adjacent properties, I would reject it at once. Fictions are, or are becoming, jurisprudentially extinct.

Finally, I find little in the Court's opinion to support its view on the "expanded use" issue. A road which in 1909 was sufficient for all purposes *then and at that time* required of it may or may not have been sufficient for the 1929 one-ton Ford logging truck of 1929, or for the truck-trailer combinations in use today. Other than where load weight is a ground support problem, the powerful diesel engines of today will in most cases take a loaded logging truck-trailer up and down most grades and around sharp turns where even a horse and wagon might have experienced trouble. There is little in this record to support the

Court's "expanded use" concept as a theory upon which to defeat the effect of the 1909 agreement. The value of the timber is certainly not a factor for consideration in discussing "expanded use." That the volume of the timber which may be moved on today's logging trucks is greatly in excess of that which could have been carried on a 1929 one-ton Ford truck does not demonstrate an expanded use of the physical roadbed beneath those vehicles.

And, as was also the case in *Monaco v. Bennion*, on any retrial consideration should be given to the fact that in earlier days a road under construction, no matter what the center line of the survey of a fifty-foot right-of-way, was more apt to go around a large tree than over it.

Where the parties were attempting to amicably resolve their differences as to the existence of any kind of right-of-way, and if so its location, and if none, to work out some acceptable agreement for a road, it is not difficult to understand why the trial court branded the logging company's activities as "cavalier." But the liability for damages should not have been determined without a proper evaluation of the effect of the 1909 agreement. On a retrial *Monaco v. Bennion, supra,* and its probable effect upon this controversy should be given consideration.

[See following illustration ]